James LAWRENCE, Relator,

v.

**RATZLAFF MOTOR EXPRESS INC., Respondent,**

**Department of Employment and Economic Development, Respondent.**

**No. A09–1957.**

Court of Appeals of Minnesota.

July 27, 2010.

Paul Onkka, Southern Minnesota Regional Legal Services, Inc., Shakopee, MN, for relator.

Ratzlaff Motor Express Inc., Mayer, Minnesota (respondent employer) Lee B. Nelson, Britt K. Lindsay–Waterman, St. Paul, MN, for respondent Department of Employment and Economic Development.

Considered and decided by
SCHELLHAS, Presiding Judge;
STONEBURNER, Judge; and
CONNOLLY, Judge.

## OPINION

SCHELLHAS, Judge.

In this certiorari appeal, relator, a truck driver, challenges a decision on reconsideration of an unemployment-law judge that he was ineligible to receive unemployment benefits because he committed employment misconduct when his driver's license was suspended because of nonpayment of child support. We affirm.

## FACTS

On July 20, 2009, respondent Minnesota Department of Employment and Economic Development (DEED) determined that relator James Lawrence was ineligible to receive unemployment benefits because he was discharged for employment misconduct. DEED identified relator's misconduct as failing to obtain or maintain a driver's license or certification due to intentional or negligent conduct. Relator appealed the ineligibility determination and an unemployment-law judge (ULJ) held a hearing.

At the hearing, Ben Ratzlaff testified on behalf of respondent-employer Ratzlaff Motor Express Inc. that relator was an over-the-road truck driver who earned 32% of the truck's revenue and was discharged after his driver's license was suspended "due to a child support issue." Ratzlaff testified that, although relator was "working on getting [his driver's-license suspension] taken care of," Ratzlaff could not wait and had to put another driver in the truck. Ratzlaff further testified that Ratzlaff Motor had advanced money to relator so that he could "live out on the road," and that at some point Ratzlaff Motor was advancing more money to relator than he was owed. Relator's child support was paid through income withholding, and Ratzlaff Motor paid the child support out of what was left after taxes and Ratzlaff Motor's advances to relator. Ratzlaff understood that relator's driver's license was suspended because his child support was not paid, and Ratzlaff Motor discharged relator on May 2, 2009.

Ratzlaff testified that relator's child support was initially $1,800 per month, but that in February 2009, Ratzlaff received a notice that it was reduced to $1,063.20 per month. Relator testified that he did not know that his license had been suspended. When the ULJ suggested that he must have been aware that he was not able to make his full child-support payment, even at the lower amount, relator responded that he could not pay his child support because his truck was not being dispatched and he would "sit for two days waiting on a load," which made his revenue go down. Relator claimed that the decline in his revenue was neither his fault nor Ratzlaff's fault.

Relator submitted two paystubs that showed deductions for advances to him and for child support. Ratzlaff Motor submitted a form that it completed stating that relator did not earn enough income to pay his child support, and that he had been warned on January 1, 2009, that he was receiving more money in advances than he was earning on a weekly basis.

The ULJ found that relator was discharged after his license was suspended for nonpayment of child support, and that without a valid license relator could not perform his duties as an over-the-road

truck driver. The ULJ noted that it was relator's responsibility to make sure his child support payments were made, that relator's child-support payments were high, and that it was incumbent on him to go into court to have the payments modified to an acceptable level and to make sure the payments were made. The ULJ concluded that relator's "failure in this regard" resulted in his license being suspended and was conduct that met the definition of employment misconduct. Relator sought reconsideration and the ULJ affirmed. This appeal follows.

## ISSUES

I. Did relator, a truck driver, commit employment misconduct by failing to maintain his driver's license, which was needed for his employment?

II. Did the ULJ meet his duty to develop the record?

## ANALYSIS

### I

Relator challenges the ULJ's conclusion that he committed employment misconduct when he failed to maintain his driver's license, which was necessary for his employment. Relator argues that the ULJ's decision is unsupported because the record lacks evidence demonstrating that relator knew that his child support was not being paid and knew that nonpayment could result in license suspension.

When reviewing a ULJ's decision, this court may affirm or remand, or may reverse or modify the decision if the substantial rights of the petitioner may have been prejudiced because the findings, inferences, conclusion, or decision are, among other things, in violation of constitutional provisions, affected by an error of law, or unsupported by substantial evidence. Minn.Stat. § 268.105, subd. 7(d) (2008).

An applicant who was discharged for employment misconduct is ineligible for unemployment benefits. Minn.Stat. § 268.095, subd. 4 (2008). Employment misconduct means any intentional, negligent, or indifferent conduct, on or off the job, "that displays clearly a serious violation of the standards of behavior the employer has the right to reasonably expect," or "that displays clearly a substantial lack of concern for the employment." *Id.,* subd. 6(a). This definition "is exclusive and no other definition applies." *Id.,* subd. 6(e) (2008).

"Whether an employee committed employment misconduct is a mixed question of fact and law." *Skarhus v. Davanni's Inc.,* 721 N.W.2d 340, 344 (Minn.App.2006) (citing *Schmidgall v. FilmTec Corp.,* 644 N.W.2d 801, 804 (Minn.2002)). "Whether the employee committed a particular act is a question of fact." *Id.* Factual findings are reviewed in the light most favorable to the decision, giving deference to the credibility determinations made by the ULJ, and will not be disturbed when the evidence substantially sustains them. *Id.* "But whether the act committed by the employee constitutes employment misconduct is a question of law, which we review de novo." *Id.*

Both parties discuss precedent decided under the definition of misconduct found in *Tilseth v. Midwest Lumber Co.,* 295 Minn. 372, 204 N.W.2d 644 (1973), which previously supplemented the former statutory definition of misconduct. "Under *Tilseth,* misconduct required an employee's willful activity that evinced a disregard of an employer's interest, disregard of the stan-

dards of behavior that an employer had a right to expect, or lack of concern for an employee's duties." *Hanson v. Crestliner Inc.*, 772 N.W.2d 539, 543 (Minn.App.2009). Notably, the 2008 statutory definition of misconduct differs from the definition in *Tilseth* in that it includes "intentional, negligent, or indifferent conduct." Minn.Stat. § 268.095, subd. 6(a); *Hanson,* 772 N.W.2d at 543. But cases decided under *Tilseth* remain instructive as to the areas in which the *Tilseth* and 2008 statutory definitions overlap. *Hanson,* 772 N.W.2d at 543.

Both parties discuss *Markel v. City of Circle Pines,* 479 N.W.2d 382, 383 (Minn. 1992), a case in which the supreme court addressed an employee's loss of a driver's license needed for employment due to the employee's alcohol-related driving offense. Markel's license was revoked for one year,[1] and his employer first suspended him because he could no longer perform his normal job duties and later terminated him because he could not obtain a Class C limited license. *Markel,* 479 N.W.2d at 383. The supreme court applied *Tilseth* and held that "conduct which results in the loss of a license necessary for the performance of normal job duties is misconduct." *Id.* at 385. The court stated that, "[a]s an employee whose ability to perform his job depended on his having a valid driver's license, Markel's behavior—drinking and driving—simply does not come within the *Tilseth* exceptions for inadvertence, negligence or errors in judgment." *Id.* The supreme court further explained: "While some unintentional circumstances which lead to loss of a necessary occupational license might be treated differently, Markel's conduct in driving drunk, thus putting at risk his ability to drive his employer's vehicles due to loss of his driver's license, is misconduct" because "it showed an intentional and substantial disregard of his duties and obligations to his employer." *Id.* The supreme court added that Markel "necessarily must have understood the risk which he was taking" because he had previously "lost his ability to drive because of alcohol related violations of the law." *Id.*

■ Here, DEED argues that relator's loss of license is analogous to Markel's, and relator argues that his loss was unintentional and therefore not analogous to Markel's. Relator argues that the record does not contain evidence showing that he knew that his child support was not being paid or knew that he could lose his license for nonpayment. But relator's attempt to characterize his nonpayment of child support as an unintentional circumstance that led to his driver's license suspension is unpersuasive, and his argument that his employer did not notify him that his income was insufficient to pay his child support in full is also unpersuasive. Relator's paystubs show the amounts deducted for child support and the advances he received from his employer, and relator's employer warned him that his advances exceeded his income. As noted by the ULJ, relator was responsible to ensure that his child support was paid.

We conclude that relator engaged in intentional, negligent, or indifferent conduct that resulted in the loss of a license necessary for the performance of his job duties, and therefore engaged in employment misconduct.

II

■ Relator argues that the ULJ did not adequately develop the record, citing

---

1. Markel had two previous alcohol-related driving violations, one of which resulted in license revocation. *Markel,* 479 N.W.2d at 383.

Minn. R. 3310.2921 (2009), which requires a ULJ to "ensure that relevant facts are clearly and fully developed." A Minnesota statute likewise states that a ULJ "must ensure that all relevant facts are clearly and fully developed." Minn.Stat. § 268.105, subd. 1(b) (Supp.2009). Relator argues that the ULJ did not inquire as to what information was provided to relator about his income and child-support withholding and did not inquire about any notices received by relator from the child-support-collection authorities.

In this case, the ULJ gave both parties ample opportunity to offer testimony and questioned relator about his child-support obligation and whether he knew that his revenue was insufficient. Relator is correct that the ULJ did not ask him if he knew of the possibility of suspension for nonpayment of support. But at the agency level, relator did not argue that he had to know of the possibility of suspension for nonpayment for his license suspension to amount to misconduct. Moreover, because negligent or indifferent conduct constitutes misconduct under section 268.095, relator's conduct need not be knowing to be misconduct. We conclude that the ULJ adequately developed the record in this case.

## DECISION

When an employee's child-support obligation is unpaid due to the employee's intentional, negligent, or indifferent conduct and the employee's driver's license necessary for employment is therefore suspended, the employee commits employment misconduct.

**Affirmed.**