James CUNNINGHAM, Relator,

v.

**WAL–MART ASSOCIATES, INC., Respondent,**

**Department of Employment and Economic Development, Respondent.**

**No. A11–153.**

Court of Appeals of Minnesota.

Dec. 27, 2011.

Peter B. Knapp, William Mitchell Law Clinic, Justin McCluskey (certified student attorney), St. Paul, MN, for relator.

Wal–Mart Associates, Inc., c/o TALX UCM Services, Inc., St. Louis, MN, respondent.

Lee B. Nelson, Amy R. Lawler, Minnesota Department of Employment and Economic Development, St. Paul, MN, for respondent Department of Employment and Economic Development.

Considered and decided by CONNOLLY, Presiding Judge; HALBROOKS, Judge; and HARTEN, Judge.*

---

\* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

## OPINION

HALBROOKS, Judge.

Respondent Wal–Mart Associates, Inc. discharged relator James Cunningham after he failed to report to work or call in for five consecutive shifts. Cunningham began collecting unemployment benefits. Wal–Mart challenged Cunningham's eligibility status, and the unemployment-law judge (ULJ) determined that Cunningham is ineligible because he was discharged for employment misconduct. Cunningham argues on appeal that his actions were not misconduct because they were a consequence of his mental impairment. Because we conclude that Cunningham's performance problems were a consequence of his mental impairment, we reverse.

### FACTS

In November 2008, Cunningham suffered a series of four transient ischemic attacks, also referred to as mini-strokes. The strokes resulted in paralysis on Cunningham's left side. He had an angioplasty to remove blockage in an artery in his head and underwent months of occupational, speech, and physical therapy. Cunningham testified that he mostly recovered from his strokes, but has continued to experience numbness in his fingers, trouble with comprehension and multitasking, and some lingering difficulty with memory and concentration.

On April 1, 2009, Cunningham began working at Wal–Mart, doing business as Sam's Club, in Fridley as a part-time, overnight stocker. When Cunningham first started at Wal–Mart, there were 11 people on the overnight crew, and he worked in the gum section. In spring of 2010, a new store manager, B.J., took over and began to streamline the night crew by using fewer people to cover more areas. Cunningham's team was reduced from 11 to 6 people, and his responsibilities were ex-

panded to include the freezer, cooler, meat, and water and soft drink sections. With the increased responsibilities, Cunningham had difficulty completing the work within his shift. But because Cunningham was a part-time employee (working less than 34 hours per week), he was unable to work extra time. Cunningham received an oral coaching from the overnight assistant manager, Julie Scott, on June 27, 2010, because he left a trash bin out and had missing or crooked signs on three different shifts. To resolve the issues, Scott had Cunningham walk his area with her or another supervisor at the end of each shift to be certain that everything was properly taken care of.

Sometime in July 2010, Cunningham wrote a letter to B.J., detailing his difficulty with comprehension and multitasking as a result of his strokes; this was the first time that Cunningham informed Wal–Mart of his condition. In response to the letter, B.J. and Scott met with Cunningham and discussed possible workplace accommodations. Cunningham explained that he felt that his performance problems were a result of his continuing mental impairment from the strokes. B.J. told Cunningham that a formal request for an accommodation would require an extreme amount of paperwork and that he "didn't think [Cunningham] wanted to go through that."

After the meeting, Cunningham continued to have performance problems. On August 7, 2010, he received another coaching based on four unexcused absences since April 2010. Scott advised Cunningham to "[a]bide by [the] attendance and punctuality policy" and told him that if the behavior continued, the next level of action would be "[d]ecision day up to and including termination."

On August 30, 2010, Scott and another overnight supervisor met with Cunning-

ham to give him what the company referred to as a "decision day" final warning. Cunningham was told that his job performance was unsatisfactory because he continued to have problems clearing floors, keeping the product and the signs straight on shelves, and replacing missing signs. At the hearing, Scott described the decision-day procedure as follows:

> A decision making day is if it's done at the beginning of your shift, you punch out and go home for that day with pay, and you're supposed to try and come up with a written plan of action as to what you're going to do differently so that you can meet the expectations. And then you come in on your next scheduled shift with that written plan of action.

> . . . .

> We can't tell them what to write in their action plan, only that it needs to be a plan of action of what they're going to do to make sure that they're meeting the expectations, and in this case it was to have straight pallets, straight signs, everything signed before he left.

> . . . .

> For me personally I expected him to come back with something along the lines of double checking his area, or having a supervisor walk his area off with him, that's something we had done in the past with him. He had to have myself or a supervisor walk his area off before he left. He requested that we not do that because he felt singled out, and he didn't appreciate it. So we stopped doing that. So for his plan of action I would have expected something along those lines. Something to double check and make sure that it's getting completed to the expectations set.

Cunningham did not write an action plan, so he did not report for his next five shifts and did not call in. Wal–Mart discharged Cunningham for job abandonment on September 14, 2010. Cunningham filed for and received unemployment benefits. Wal–Mart appealed Cunningham's eligibility for benefits, claiming that he was discharged for committing employment misconduct.

At the commencement of the telephone hearing before the ULJ, Cunningham asked for a written copy of the proceedings, stating that he is a "little slow" as a result of his strokes and that he wanted family members to review the proceedings with him to make sure that he was treated fairly. Cunningham explained that his sister-in-law kept all of his documents for him and had helped him apply for unemployment benefits.

After the hearing, the ULJ concluded that Cunningham "intentionally refused to report for several consecutive shifts and failed to call in because he did not want to prepare an action plan or continue to work subject to more intensive supervision." The ULJ determined that Cunningham's "conduct was a serious violation of the standards of behavior his employer had a right to reasonably expect and constituted employment misconduct." The ULJ concluded that Cunningham is therefore ineligible to receive benefits under Minn.Stat. § 268.095, subd. 4 (2010). Cunningham's request for reconsideration was denied. This certiorari appeal follows.

## ISSUE

Was Cunningham's conduct a consequence of his mental impairment?

## ANALYSIS

When reviewing the decision of a ULJ, this court may affirm the decision, remand the case for further proceedings, or reverse or modify the decision if the substantial rights of the relator have been prejudiced because the findings, infer-

ences, conclusion, or decision are affected by error of law or unsupported by substantial evidence in view of the entire record as submitted. Minn.Stat. § 268.105, subd. 7(d)(4), (5) (2010).

██ Whether an employee engaged in employment misconduct presents a mixed question of fact and law. *Stagg v. Vintage Place Inc.*, 796 N.W.2d 312, 315 (Minn. 2011). Whether the employee committed a particular act is an issue of fact. *Skarhus v. Davanni's Inc.*, 721 N.W.2d 340, 344 (Minn.App.2006). This court views questions of fact in the light most favorable to the decision of the ULJ and gives deference to the ULJ's credibility determinations. *Id.* Findings of fact will be upheld if they are supported by substantial evidence in light of the entire record. Minn.Stat. § 268.105, subd. 7(d)(5). Whether the facts constitute employment misconduct is a question of law, which this court reviews de novo. *Schmidgall v. FilmTec Corp.*, 644 N.W.2d 801, 804 (Minn.2002).

██ An employee who is discharged for employment misconduct is ineligible for unemployment benefits. Minn.Stat. § 268.095, subd. 4(1). "Employment misconduct means any intentional, negligent, or indifferent conduct, on the job or off the job that displays clearly: (1) a serious violation of the standards of behavior the employer has the right to reasonably expect of the employee; or (2) a substantial lack of concern for the employment." *Id.*, subd. 6(a) (2010). An employee's refusal to abide by the employer's reasonable policies ordinarily constitutes employment misconduct. *Schmidgall*, 644 N.W.2d at 804. Minnesota law allows an employer to establish and enforce reasonable rules governing employee absences. *Wichmann v. Travalia & U.S. Directives, Inc.*, 729 N.W.2d 23, 28 (Minn.App.2007).

██ As part of Cunningham's job responsibilities, Wal–Mart expected him to keep his areas clean and to properly maintain the product signs. Wal–Mart also required employees to call in to report any absence from a scheduled shift. Should an employee not report to work for three consecutive days, it was considered a voluntary resignation. Cunningham missed five consecutive shifts without calling in. His failure to call regarding his absences was a serious violation of the standard that Wal–Mart had a right to reasonably expect of its employees. Because Cunningham's conduct violated Wal–Mart's reasonable expectations, we agree with the ULJ that such conduct could constitute employment misconduct under Minn.Stat. § 268.095, subd. 6(a)(1). But that does not end the analysis.

The ULJ erred by failing to consider Minn.Stat. § 268.095, subd. 6(b)(1) (2009 Minn. Laws ch. 15, § 9, at 47–48), in his decision. That section provides: "Regardless of paragraph (a), the following is not employment misconduct: (1) conduct that was a consequence of the applicant's mental illness or impairment." Minn.Stat. § 268.095, subd. 6(b)(1). Before this subdivision was enacted, the statute did not address mental illness or impairment and provided only that "absence because of illness or injury with proper notice to the employer [is] not employment misconduct." Minn.Stat. § 268.095, subd. 6(a) (2008).

It is undisputed that Cunningham suffers from a mental impairment. The ULJ found that Cunningham has memory and concentration problems as a result of his strokes and that Wal–Mart was aware of his impairment as a result of the letter Cunningham wrote to the company and the July 2010 meeting involving Cunningham, Scott, and B.J. Further, respondent Minnesota Department of Employment

and Economic Development conceded during oral argument that Cunningham has a mental impairment. The dispute in this case centers on the second requirement of subdivision 6(b)(1)—whether Cunningham's conduct was a consequence of his mental impairment. Based on this record, we conclude that it was.

The following exchange occurred at the hearing when the ULJ questioned Cunningham about the reason he did not return to work or call in after the decision-day meeting:

ULJ: Okay, but I mean did you understand that you were still on the schedule for September 3rd and the days thereafter.

CUNNINGHAM: I did, but I also understood that if I did not have that in writing as to how I was gonna fix it, that I was not supposed to come back, that was exactly how it was told to me and that's exactly what I did.

. . . .

ULJ: So really the reason why you didn't do an action plan was you just didn't believe there was any fix for your problem.

CUNNINGHAM: Right.

ULJ: It wasn't that you didn't know how to make one out.

CUNNINGHAM: Right, exactly.

ULJ: Okay, got it. Are you saying you quit your job then.

CUNNINGHAM: No I'm not, I'm saying they told me not to come back unless I had an action plan, I knew that there was no real action plan that I could write that could fix my mental problems that I had as far as putting it into action, so I did not write one and I assumed that that's exactly what I was supposed to do and that if they wanted something further they would call and say you know why aren't you in here, why didn't you do this, or whatever. Which never happened, I never got a call and I never pursued it because I told them before I ever left that office with those two people that I honestly did not think I could put an action plan together and they were both fully aware of that.

And Scott, while clear in her testimony that she did not instruct Cunningham that he should not come in unless he had an action plan, acknowledged that he might have interpreted her remarks that way:

ULJ: Did you ever say that a condition of him coming in and reporting was to have an action plan?

SCOTT: Not that I'm aware of. Not that I recall anyway.

ULJ: Okay.

SCOTT: Come in on your next scheduled shift with your action plan. *So he may have taken it that way but I never said not to come in if he didn't have one.*

(Emphasis added.)

The ULJ made several factual findings, including that: Cunningham has memory and concentration problems because of his strokes, he informed Wal–Mart that his workplace performance was related to his condition from his strokes, and Cunningham "did not believe there were any reasonable steps he could take to correct his performance problems." Based on this record, we conclude that Cunningham's conduct of not showing up or calling Wal–Mart to report his absences following the decision-day meeting was a consequence of his mental impairment.

## DECISION

Because pursuant to Minn.Stat. § 268.095, subd. 6(b)(1), the conduct for which Cunningham was discharged was a consequence of his mental impairment, he did not commit employment misconduct.

Cunningham is therefore eligible to receive unemployment benefits.

**Reversed.**