*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2012).*

## STATE OF MINNESOTA
## IN COURT OF APPEALS
## A13-1815

Cynthia Stephen,
Relator,

vs.

Pro Pilots, LLC,
Respondent,

Department of Employment and Economic Development,
Respondent.

**Filed July 14, 2014**
**Reversed**
**Rodenberg, Judge**

Department of Employment and Economic Development
File No. 31203329-3

John N. Sellner, Winthrop & Weinstine, P.A., Minneapolis, Minnesota (for relator)

Lee B. Nelson, Christine E. Hinrichs, Munazza Humayun, Department of Employment
and Economic Development, St. Paul, Minnesota (for respondent DEED)

Considered and decided by Johnson, Presiding Judge; Rodenberg, Judge; and

Chutich, Judge.

UNPUBLISHED OPINION

**RODENBERG**, Judge

Relator Cynthia Stephen petitions for certiorari review of the determination of the unemployment law judge (ULJ) that each of the following constituted employment misconduct: (1) relator's failure to provide "proper notice" to respondent Pro Pilots, LLC (employer) of her illness-related absences, and (2) relator's "negligent" work performance. We reverse.

## FACTS

Relator began her employment as a charter sales executive with employer on March 22, 2012. Employer's business includes chartering planes for various clients. Relator's job duties included managing and responding to sales emails, answering sales phone calls and "logging" the callers' information, and attending weekly sales meetings. She was required to work from 8:00 a.m. to 4:30 p.m. Mondays through Fridays and work nights and weekends "as requested." When relator commenced her employment, she was given Pro Pilot's sick-leave policies, which stated: "Employees who are unable to report to work due to temporary illness or injury should notify their direct supervisor before the scheduled start of their workday."

Relator occasionally missed work due to a chronic medical condition, the legitimacy and severity of which is not in dispute. After several absences in the summer of 2012, relator received a written warning that set forth a policy for illness-related absences requiring relator to provide two-hour advance notice of same-day absences and a doctor's note explaining each illness-related absence. After she received this policy,

relator was again absent January 14, 15, 17 and 18. On April 4, 2013, relator worked from home due to medical reasons and informed Pro Pilots by email at 2:18 p.m. On April 11, 2013, while at a work-related lunch, relator left work early due to the sudden onset of symptoms and had a coworker notify Pro Pilots. The ULJ found that relator always notified Pro Pilots of her absences, but on certain occasions did not do so until after the start of her shift.

As a result of the April 11 absence, relator received a "final written warning for leaving work early without prior approval" on April 16, 2013. The warning included a policy that relator must notify a supervisor of any future emergencies requiring her to leave work. It also stated that relator was required to bring her performance to a satisfactory level within 30 days and that "[f]ailure to adhere to the conditions of this written warning . . . will lead to more serious corrective action and you[r employment] may be terminated." Relator's only absence after receiving this warning was on May 6, when she was told to work from home after notifying Pro Pilots that she may have pinkeye (which is not the chronic condition plaguing relator). While working from home, she was asked by a supervisor to obtain a doctor's note before returning to work. She obtained the note. The next day, she was discharged. Relator was told the reason for her discharge was that she "disappeared for two hours" the previous day (during which time she obtained a doctor's note). The ULJ concluded that, because relator sometimes provided notice of her illness-related absences after the start of her shift, she had committed employment misconduct.

The "employee termination letter" given to relator when she was discharged listed "unsatisfactory job performance" as a second reason for her discharge: Concerning relator's work performance, the ULJ found that "[she] frequently showed up unprepared for meetings and frequently missed emails even after coaching by [a supervisor]. She failed to log calls and provided misinformation to clients. By March 2013, [a supervisor] had taken on most of the responsibilities for which [relator] was hired." The ULJ concluded that relator had committed employment misconduct based on a finding that her job performance had been "negligent." Upon reconsideration, the ULJ affirmed his decision, and this certiorari appeal followed.

**D E C I S I O N**

Whether an employee engaged in conduct resulting in disqualification from unemployment benefits is a mixed question of fact and law. *Schmidgall v. FilmTec Corp.*, 644 N.W.2d 801, 804 (Minn. 2002). Whether the employee committed the particular act is a question of fact. *Scheunemann v. Radisson S. Hotel*, 562 N.W.2d 32, 34 (Minn. App. 1997). Whether a particular act constitutes employment misconduct is a question of law, which we review de novo. *Schmidgall*, 644 N.W.2d at 804.

An employee who is discharged from employment for misconduct is ineligible to receive unemployment benefits. Minn. Stat. § 268.095, subd. 4(1) (2012). "Employment misconduct means any intentional, negligent, or indifferent conduct, on the job or off the job that displays clearly: (1) a serious violation of the standards of behavior the employer has the right to reasonably expect of the employee; or (2) a substantial lack of concern for the employment." *Id.*, subd. 6(a) (2012). The ULJ held that relator's illness-related

4

absences and negligent work performance constituted employment misconduct. We address both determinations in turn.

## I.

In general, an employee's refusal to abide by an employer's reasonable policies and requests is disqualifying misconduct. *Schmidgall*, 644 N.W.2d at 804. "Minnesota law allows an employer to establish and enforce reasonable rules governing employee absences." *Cunningham v. Wal-Mart Assocs., Inc.*, 809 N.W.2d 231, 235 (Minn. App. 2011). But absence from work due to illness or injury is not considered employment misconduct if the employee provides proper notice to the employer. Minn. Stat. § 268.095, subd. 6(b)(7) (2012).

Caselaw does not firmly establish what constitutes "proper notice" of absence due to illness. It is undisputed that Pro Pilots expressed a policy that relator was to provide notice of her illness-related absences at least two hours in advance. The ULJ concluded that "the record does not support that [relator] made reasonable efforts to provide notice to Pro Pilots of her absences and tardiness" and that there were instances when she did not provide notice until after her shift had started. He concluded that this displayed "a substantial lack of concern for the employment," and relator had therefore committed employment misconduct.

Relator argues, and the record supports, that she gave notice to the employer every time she was absent due to illness and that, due to the unpredictable nature of her illness, her late notices were "conduct an average reasonable employee would have engaged in under the circumstances." *See id.*, subd. 6(b)(4) (2012) (listing an exception to the

5

definition of employment misconduct). Respondent Minnesota Department of Employment and Economic Development counters by arguing that relator consistently failed to provide notice before the start of her shift and that "an average reasonable employee would have talked to her employer and explained the reason for these unexpected absences, delay in reporting those absences, and reasons why a doctor's note may have been impractical." But the precise issue before us is narrower than examining the entire course of relator's employment.

Relator was discharged in direct response to her absence on May 6, 2013 due to suspected pinkeye. This was relator's *only* absence after she received the "final written warning" on April 16, 2013 regarding her attendance. This warning stated that it was relator's opportunity to correct her unsatisfactory performance and that *continued failure* to follow Pro Pilots's policies could result in discharge.

The record allows no conclusion other than that relator complied with Pro Pilots's policies and directions when she notified her supervisor of what she thought was pinkeye. In fact, her supervisor instructed her to work from home after relator told him of her symptoms. A different supervisor contacted relator that afternoon and directed that she obtain a doctor's note before returning to work the next day. She did that as well. Despite complying with all of Pro Pilots's policies and despite complying with the requests of two supervisors concerning the pinkeye incident, relator was discharged the following day. Relator fully complied with Pro Pilots's policies and the specific directions of her supervisor, which does not constitute employment misconduct. *See id.*, subd. 6(b)(7) (medical absences with notice are not employment misconduct);

6

*Schmidgall*, 644 N.W.2d 804 (stating that an employee must generally comply with the employer's reasonable policies).[1]

## II.

Employment misconduct does not include inefficiency or inadvertence, simple unsatisfactory conduct, poor performance because of inability or incapacity, or good-faith errors in judgment. Minn. Stat. § 268.095, subd. 6(b) (2012). The ULJ held that "[relator's] negligent performance seriously violated the standards [that the employer] had the right to reasonably expect," constituting misconduct. *See id.*, subd. 6(a)(1). The meaning of "negligent" is of central importance in this appeal.

In interpreting an older version of the unemployment insurance statute, our supreme court explained:

> The intended meaning of the term "misconduct" is limited to conduct evincing such wilful or wanton disregard of an employer's interests as is found in deliberate violations or disregard of standards of behavior which the employer has the right to expect of his employee, or in carelessness or negligence of such degree or recurrence as to manifest equal culpability, wrongful intent or evil design, or to show an intentional and substantial disregard of the employer's interests or of the employee's duties and obligations to his employer.

---

[1] At oral arugment, DEED's counsel argued that we should not only look at relator's last absence, but we also must look at the "totality of the circumstances," citing *Jones v. Rosemount, Inc.*, 361 N.W.2d 118 (Minn. App. 1985), as support. *Jones* held that the decision-maker had improperly placed emphasis on the employee's last absence being outside of her control given the fact that she had a habit of absenteeism (not due to illness or injury). 361 N.W.2d at 120. Here, because relator was specifically given an opportunity to correct her behavior and did so, this case is readily distinguishable from *Jones*, wherein the employee took no steps to rectify the reasons for her eventual discharge, even if her last absence was due to reasons outside her control. *See id.* at 119-20.

7

*Tilseth v. Midwest Lumber Co.*, 295 Minn. 372, 374-75, 204 N.W.2d 644, 646 (1973) (quotation omitted), *superseded by statute* Minn. Stat. § 268.09, subd. 12 (Supp. 1997) *as recognized in Houston v. Int'l Data Transfer Corp.*, 645 N.W.2d 144, 149 (Minn. 2002)). The *Tilseth* court went on to explain: "[M]ere inefficiency, unsatisfactory conduct, failure in good performance as the result of inability or incapacity, inadvertencies or *ordinary negligence in isolated instances*, or good-faith errors in judgment or discretion are not to be deemed 'misconduct.'" *Id.* at 375, 204 N.W.2d at 646 (emphasis added) (quotation omitted).

The current version of the unemployment insurance statutes incorporates much of the above-quoted language. Although "negligent" conduct is included in the definition of "employment misconduct," Minn. Stat. § 268.095, subd. 6(a), the following are excluded from the definition of employment misconduct: (1) inefficiency or inadvertence, (2) simple unsatisfactory conduct, (3) conduct as the result of inability or incapacity, and (4) good-faith errors in judgment, *id.*, subd. 6(b)(2)-(3), (5)-(6). This case raises the issue of whether "ordinary negligence" should now be considered disqualifying "employment misconduct." *See id.*, subd. 6(a).

Because the list of exceptions to the statutory definition of employment misconduct includes terms that are synonymous with ordinary negligence (e.g. "inefficiency or inadvertence," and "good faith errors in judgment"), we conclude that the legislature did not intend for ordinary negligence to fall within the definition of "employment misconduct." *Tilseth* specifically referenced "inadvertencies or ordinary negligence in isolated circumstances," 295 Minn. at 375, 204 N.W.2d at 646, and

8

ordinary negligence appears to us to be included within the current statute's reference to "inefficiency or inadvertence," Minn. Stat. § 268.095, subd. 6(a), (b)(2). Despite the exclusivity provision of the statute concerning the definition of "employment misconduct," *id.*, subd. 6(e), something more than ordinary negligence is required in order for an employee's conduct to constitute employment misconduct under the current statute. We therefore consider whether relator's "negligent" conduct was more egregious than "ordinary negligence."

Relator argues that her poor job performance does not amount to intentional or negligent disregard for her employment and that Pro Pilots presented no evidence that it was intentional or negligent. Pro Pilots counters that while some of relator's "failures may be attributable to inefficiency or inadvertence, the record shows that she did not comply with basic instructions from management related to her job responsibilities." Although it is undisputed that relator was unable to perform her job satisfactorily, Pro Pilots has provided absolutely no evidence of, nor did it even claim that, appellant was indifferent or deliberately ignored her job responsibilities. The list of job-performance issues relied on by the ULJ in determining that relator was negligent includes instances where relator made mistakes due to inadvertence or her inability or incapacity to do the job. This record does not support a conclusion that relator's conduct was anything more than "ordinary negligence." *See Tilseth*, 295 Minn. at 375, 204 N.W.2d at 646. Therefore, relator's poor job performance does not constitute "employment misconduct" as defined by Minn. Stat. § 268.095, subd. 6(a), (b)(2).

The ULJ erred in concluding that relator's illness-related absences constitute employment misconduct and in determining that relator's poor work performance was employment misconduct. Because we reverse on purely legal grounds, we do not reach relator's arguments regarding the ULJ's factual findings and credibility determinations.

**Reversed.**