*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2012).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A13-2346**

Richard Hammerstad,
Relator,

vs.

Princeton Auto Center, Inc.,
Respondent,

Department of Employment and Economic Development,
Respondent.

**Filed September 29, 2014
Reversed
Schellhas, Judge**

Department of Employment and Economic Development
File No. 31529816-3

Richard Hammerstad, Milaca, Minnesota (pro se relator)

Princeton Auto Center, Princeton, Minnesota (respondent)

Lee B. Nelson, Department of Employment and Economic Development, St. Paul, Minnesota (for respondent Department of Employment and Economic Development)

Considered and decided by Worke, Presiding Judge; Schellhas, Judge; and Harten, Judge.[*]

---

[*] Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

UNPUBLISHED OPINION

**SCHELLHAS**, Judge

Relator challenges an unemployment-law judge's decision that he is ineligible for unemployment benefits due to employment misconduct. We reverse.

## FACTS

Respondent Princeton Auto Center, Inc., hired relator Richard Hammerstad as a technician in November 1999, knowing that he did not have a valid driver's license, and continued to employ him until August 14, 2013. At the time of his hiring, Hammerstad agreed that he would obtain a valid driver's license as soon as possible. In January 2000, Hammerstad provided Princeton with documents, including a receipt for a driver's license exam, resulting in Princeton's belief that Hammerstad had obtained a driver's license. In September 2008, a local police officer told Princeton that Hammerstad did not have a driver's license. Princeton therefore required Hammerstad to sign a form, acknowledging that he was not allowed to drive any company vehicle or to take customer vehicles on public roads and that violations could result in termination. The last sentence on the form reads: "Princeton Auto *highly recommends* that Rich gets a valid license." (Emphasis added.) Despite Princeton's attempts to assist Hammerstad in obtaining his driver's license, Hammerstad never obtained a valid driver's license while employed by Princeton.

On August 11, 2013, Hammerstad was arrested for driving while impaired (DWI). Hammerstad consequently was absent from work without excuse on August 12. Princeton gave him permission to be absent from work on August 13 so that he could try to get his

vehicle out of the impound lot. When Hammerstad returned to work on August 14, Princeton discharged him from employment. Hammerstad sought unemployment benefits, and respondent Minnesota Department of Employment and Economic Development (DEED) determined that he was ineligible because he was discharged for employment misconduct. Hammerstad appealed the determination. After an evidentiary hearing, an unemployment-law judge (ULJ) concluded that Hammerstad was ineligible for unemployment benefits because he was discharged for employment misconduct and affirmed his decision on reconsideration.

This certiorari appeal follows.

## D E C I S I O N

Hammerstad challenges the ULJ's determination that he is ineligible for unemployment benefits due to employment misconduct. This court reviews a ULJ's decision denying benefits to determine, among other things, whether the findings, inferences, conclusions, or decision are affected by an error of law, are unsupported by substantial evidence in view of the entire record, or are arbitrary or capricious. 2014 Minn. Laws, ch. 271, art. 1, § 1 (to be codified at Minn. Stat. § 268.105, subd. 7(d) (2014)).[1] Appellate courts "narrowly construe the disqualification provisions of the [unemployment-benefits] statute in light of their remedial nature, as well as the policy that unemployment compensation is paid only to those persons unemployed through no

---

[1] We cite the most recent version of this statute in this opinion because it has not been amended in relevant part. *See Interstate Power Co. v. Nobles Cnty. Bd. of Comm'rs*, 617 N.W.2d 566, 575 (Minn. 2000) (stating that, generally, "appellate courts apply the law as it exists at the time they rule on a case").

3

fault of their own." *Stagg v. Vintage Place Inc.*, 796 N.W.2d 312, 315 (Minn. 2011) (quotations omitted); *see* Minn. Stat. §§ 268.03, subd. 1 (no fault of their own), .031, subd. 2 (remedial nature) (2012). Appellate courts review de novo as a question of law "whether a particular act constitutes disqualifying misconduct," *Stagg*, 796 N.W.2d at 315, but "[w]hether the employee committed a particular act is an issue of fact," *Cunningham v. Wal–Mart Assocs.*, 809 N.W.2d 231, 235 (Minn. App. 2011). We "review the ULJ's factual findings in the light most favorable to the decision." *Stagg*, 796 N.W.2d at 315 (quotation omitted). "Whether an employee engaged in conduct that disqualifies the employee from unemployment benefits is a mixed question of fact and law." *Id.* (quotation omitted).

After Hammerstad applied for unemployment benefits, Princeton explained to DEED that it discharged Hammerstad from employment because "Mr. Hammerstad does not have a valid driver's license due to a recent DUI and is therefore not able to drive vehicles and perform his duties as described at time of hire." DEED asked Princeton whether a license was a requirement of Hammerstad's job, and Princeton responded, "Yes. Mr. Hammerstad was a service technician and *driving vehicles is a required part of the job* due to diagnosis and other facets of vehicle repair." (Emphasis added.) Princeton acknowledged that, when it hired Hammerstad, it knew that Hammerstad did not have a driver's license. When asked if it had ever given Hammerstad any warnings, Princeton said, "Many verbal warnings were given to Mr. Hammerstad that showing up to work was a requirement and also free of all other substances. Mr. Hammerstad was a frequent call-in, 'sick,' which was the basis of the verbal warning."

4

Princeton also provided DEED the following information in response to DEED's written questions:

> Mr. Hammerstad was in the process of regaining his license and as a result of his most recent issue, as explained to us by Mr. Hammerstad, he was incarcerated as a result of being pulled over and evaluated. Princeton Auto Center has assisted Mr. Hammerstad for years in getting him back on track with his personal and professional positions. Princeton Auto Center holds no grudges against Mr. Hammerstad but with this most recent issue regaining his license in the requisite amount of time to continue his career is prohibitive from the economic standpoint of Princeton Auto Center. In researching Mr. Hammerstad's application for employment, he did not have a valid license but promised that a license would be obtained within one month of employment. On 1-26-00, Mr. Hammerstad did regain his license per document 2000751026046. It is unknown at what point Mr. Hammerstad lost his license again after this point.[2]

Finally, DEED asked Princeton whether Hammerstad knew that having a license was required for his job as a service technician and how he knew that. Princeton replied:

> Mr. Hammerstad was aware that having a valid driver's license was a prerequisite for performing his duties, legally, in that driving vehicles on state and country roads requires a valid license. In addition, the agreement between Mr. Hammerstad and Princeton Auto Center was that to retain employment a valid driver's license must be obtained. In addition to that, Princeton Auto Center has assisted for years in helping Mr. Hammerstad in regaining his license.

DEED issued an ineligibility determination, stating:

> [Princeton] discharged [Hammerstad] . . . because of a driving violation or record of violations. [Hammerstad]'s violation(s) exceeded [Princeton]'s policy or had a significant

---

[2] Document 2000751026046, marked as exhibit 12 in the record, appears to be a driver's license application signed by Hammerstad. It does not evince that Hammerstad regained his license.

> negative effect on the employment. [Hammerstad] was aware, or should have been aware, of [Princeton]'s policy or expectations. [Hammerstad]'s actions were employment misconduct.

At the evidentiary hearing following Hammerstad's appeal from the ineligibility determination, the ULJ asked Princeton's witness, Dustin Grieser, why Princeton discharged Hammerstad, and Grieser said:

> Basically the reason was . . . he incurred another DUI. In which case gaining, regaining his driver's license was going to be very difficult and that is a function of his job is to have a valid driver's license. We've assisted Mr. Hammerstad repeatedly in trying to, you know, get himself back on track one way or another, personal and professional lives. And . . . this was the latest in . . . that line.

The ULJ then pursued the topic of Hammerstad's absenteeism, asking whether "Hammerstad also miss[ed] work as a result of [his DWI]," and, when Grieser stated that he did, the ULJ asked whether "that [was] also part of the concern." Grieser answered: "*As far as that direct way, no.* He was gone for two days after that." (Emphasis added.) The ULJ continued: "Well it appears that the employer, I think it said, somewhere it was saying that the part of the reason was that he had missed work too on those days, is that was that part of the concern of the employer or no?" Grieser responded: "It was part of the concern. Well yeah absolutely it was because he wasn't here to do his job." The ULJ then said: "[S]o it sounds like there were two prongs to this both related to DUI. Number one Mr. Hammerstad couldn't get his license again because of this and that was a concern. And, number two he missed work because of the arrest, is that correct?" Grieser agreed.

6

Following the hearing, the ULJ found that Princeton discharged Hammerstad because of employment misconduct and concluded that Hammerstad was ineligible for unemployment benefits. An employee is ineligible for unemployment benefits if the employee is discharged for employment misconduct. Minn. Stat. § 268.095, subd. 4(1) (2012). "Employment misconduct means any intentional, negligent, or indifferent conduct, on the job or off the job that displays clearly: (1) a serious violation of the standards of behavior the employer has the right to reasonably expect of the employee; or (2) a substantial lack of concern for the employment." Minn. Stat. § 268.095, subd. 6(a) (2012). "As a general rule, refusing to abide by an employer's reasonable policies and requests amounts to disqualifying misconduct." *Schmidgall v. FilmTec Corp.*, 644 N.W.2d 801, 804 (Minn. 2002).

"Whether an employee's absenteeism and tardiness amounts to a serious violation of the standards of behavior an employer has a right to expect depends on the circumstances of each case." *Stagg*, 796 N.W.2d at 316. "Absence from work under circumstances within the control of the employee, including incarceration following a conviction for a crime, has been determined to be misconduct sufficient to deny benefits." *Jenkins v. Am. Exp. Fin. Corp.*, 721 N.W.2d 286, 290–91 (Minn. 2006) (noting examples of misconduct due to incarceration when "claimant simply failed to show up at work because he had been incarcerated" and "did not contact his employer until *after* he had missed work because he had been incarcerated").

Hammerstad argues that his lack of a driver's license was Princeton's sole reason for terminating him, not absenteeism. We agree. After almost 14 years of employment,

7

Hammerstad missed work on August 12 due to his incarceration, contacted Princeton later that day, and received permission to miss work on August 13 so that he could try to get his vehicle out of the impound lot. Although Princeton acknowledged that Hammerstad's missed work was a concern when asked about absenteeism by the ULJ at the evidentiary hearing, Princeton actually never stated that it discharged Hammerstad from employment for absenteeism, and the substantial evidence in the record does not support such a finding.

Hammerstad argues that his lack of a valid driver's license did not constitute employment misconduct. Under the circumstances in this case, we agree. The record reflects that Hammerstad had not had a valid driver's license since at least 1997 as the result of a DWI in Anoka County and that he had prior driver's license revocations dating back to 1984 as a result of driving while impaired. Princeton knew that Hammerstad did not have a valid driver's license when it hired him in 1999, and even if it erroneously believed that he regained his license in 2000, Princeton knew that Hammerstad did not have a valid license from 2008 until August 14, 2013, when it discharged him. Moreover, the acknowledgment that Princeton insisted that Hammerstad sign in 2008 merely recommended that he get a valid license; Princeton never actually required Hammerstad to obtain a valid driver's license. Given Hammerstad's job duties, such a requirement would have been logical and reasonable, but Princeton did not make that a condition of Hammerstad's employment.

We conclude that the ULJ erred by deciding that Princeton terminated Hammerstad's employment due to employment misconduct. Because we reverse the

8

ULJ's decision on other grounds, we need not reach Hammerstad's argument that other similarly situated employees were treated differently.

**Reversed.**