*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A15-0609**

Lucille O'Quinn,
Relator,

vs.

Noodles & Company (Corp.),
Respondent,

Department of Employment and Economic Development,
Respondent.

**Filed January 25, 2016
Affirmed
Peterson, Judge**

Department of Employment and Economic Development
File No. 33081639-3

Laura Melnick, Charles H. Thomas, Law Offices of Southern Minnesota Regional Legal Services, Inc., St. Paul, Minnesota (for relator)

Noodles & Company (Corp.), Barnett Associates, Inc., Garden City, New York (respondent)

Lee B. Nelson, Anne B. Froelich, Tim Schepers, Department of Employment and Economic Development, St. Paul, Minnesota  (for respondent department)

Considered and decided by Peterson, Presiding Judge; Halbrooks, Judge; and Reyes, Judge.

UNPUBLISHED OPINION

**PETERSON**, Judge

Relator challenges the decision by an unemployment-law judge (ULJ) that she is ineligible to receive unemployment benefits because she was discharged from employment due to employment misconduct. Because relator's failure to comply with her employer's employee-absence policy constituted employment misconduct, we affirm.

## FACTS

Relator Lucille O'Quinn worked for respondent Noodles & Company (Corp.) as a cook at a restaurant from June 2013 until she was discharged from employment on November 19, 2014. O'Quinn was late to clock in for her scheduled shifts several times from October 2014 to the date of discharge. On November 17, 2014, O'Quinn called the restaurant, spoke with general manager Rory Case, and explained that she was sick and would be out of work for a few days. Case told O'Quinn that she would need to produce a doctor's note, and O'Quinn agreed to do so. Case also told O'Quinn that she would need to find someone to cover her missed shifts. O'Quinn did not make any effort to find coverage for her missed shifts or report to work on November 17, 18, or 19, and she was discharged from employment.

O'Quinn applied for unemployment benefits, and respondent Minnesota Department of Employment and Economic Development (DEED) determined that O'Quinn was ineligible to receive benefits because she was discharged for employment misconduct. O'Quinn appealed the denial of unemployment benefits. At an evidentiary hearing before a ULJ, Case testified that he spoke with O'Quinn on the telephone on

November 17, and while he was explaining to O'Quinn Noodles' policy that she would need to find someone to cover her missed shifts, she hung up on him. Case testified that finding shift coverage involves calling other employees, Noodles maintains a list of employee telephone numbers that can be given out for the purpose of finding shift coverage, Noodles will help with calling employees if needed, and an employee is not required to physically appear at the restaurant to arrange shift coverage. Case testified that O'Quinn never "ask[ed] [him] about any of this." Case also testified about O'Quinn's repeated tardiness when clocking in for her scheduled shifts. He testified that area manager Chris Peterson decided to discharge O'Quinn due to "two no call/no shows and previous habitual tardiness."

Peterson testified that Noodles' policy is that an employee who is absent due to illness is expected to attempt to find shift coverage, that employee telephone numbers can be given out for the purpose of finding shift coverage, and that an employee is not required to physically appear at the restaurant to arrange shift coverage. Peterson testified that Case made the decision to discharge O'Quinn "because of absences the week of November 17 . . . and because she had been late to work between October 1 and November 13."

O'Quinn testified that Case explained Noodles' policy about finding shift coverage when she spoke with him on November 17, and that she told him that "it's impossible for me to find somebody to work my shift because I'm too ill . . . to come up there [to the restaurant] to . . . find somebody to work my shift." O'Quinn testified that she believed she was required to physically appear at the restaurant to look at the work schedule and a list of employee telephone numbers in order to arrange shift coverage. She had arranged

3

coverage for shifts in this way in the past. O'Quinn admitted that she did not ask Case for employee telephone numbers. Regarding her tardiness when clocking in for her scheduled shifts, O'Quinn testified that she always called when she was going to be late and that she was told "don't worry about it just as long as you make it here." She testified that her tardiness was "never . . . ma[d]e [to] seem like a big deal" and that she was "never wr[itten] up" for being late.

The ULJ determined that O'Quinn was ineligible to receive unemployment benefits because she was discharged for employment misconduct. The ULJ stated that "O'Quinn's repeated tardiness and failure to make any effort to call a substitute worker was a serious violation of the standards of behavior an employer has a right to reasonably expect." The ULJ affirmed the decision on reconsideration, and this certiorari appeal follows.

### D E C I S I O N

"Whether an employee engaged in conduct that disqualifies the employee from unemployment benefits is a mixed question of fact and law." *Icenhower v. Total Auto., Inc.*, 845 N.W.2d 849, 855 (Minn. App. 2014) (quotation omitted), *review denied* (Minn. July 15, 2014). Whether an employee committed a particular act is a fact question. *Id.* Whether a particular act constitutes disqualifying misconduct is a question of law that is reviewed de novo. *Id.* This court reviews the ULJ's factual findings in the light most favorable to the decision and defers to the ULJ's credibility determinations. *Id.* A ULJ's factual findings "will not be disturbed when the evidence substantially sustains them." *Lawrence v. Ratzlaff Motor Express Inc.*, 785 N.W.2d 819, 822 (Minn. App. 2010), *review denied* (Minn. Sept. 29, 2010).

4

An applicant for unemployment benefits who was discharged from employment because of employment misconduct is ineligible to receive benefits. Minn. Stat. § 268.095, subd. 4(1) (2014). "Employment misconduct means any intentional, negligent, or indifferent conduct, on the job or off the job that displays clearly: (1) a serious violation of the standards of behavior the employer has the right to reasonably expect of the employee; or (2) a substantial lack of concern for the employment." *Id.*, subd. 6(a) (2014). The definition of employment misconduct does not include "simple unsatisfactory conduct," "conduct that was a consequence of the applicant's inability or incapacity," "good faith errors in judgment if judgment was required," or "absence because of illness or injury of the applicant, with proper notice to the employer." *Id.*, subd. 6(b)(3), (5)-(7) (2014).

"As a general rule, refusing to abide by an employer's reasonable policies and requests amounts to disqualifying misconduct." *Icenhower*, 845 N.W.2d at 855 (quotation omitted); *see also Cunningham v. Wal-Mart Assocs.*, 809 N.W.2d 231, 235 (Minn. App. 2011) (stating that employers may "establish and enforce reasonable rules governing employee absences," a violation of which may constitute employment misconduct). Noodles' employee handbook contains a provision stating that an employee who will be absent is "expected to make every effort to find another team member to cover [her] shift." Case attempted to explain this policy to O'Quinn when they spoke on the telephone on November 17.

The ULJ found that "O'Quinn did not ask for an explanation" of the employer's policy, "did not ask for help in calling people," and "[i]nstead, . . . just did not do what her employer asked." The ULJ found:

O'Quinn did not make any efforts to find a substitute worker. This was intentional. She did not forget to find a substitute. She did not accidentally fail to call. She made a conscious choice not to call any of her coworkers. She intentionally violated a request from her employer. The reason she intentionally violated this request was because of an unreasonable assumption.

O'Quinn's unreasonable assumption does not excuse her conduct. If anything, O'Quinn's unreasonable assumption shows negligence. She should have known better. She should have known that her employer would not require her to come into the restaurant in order to get a substitute worker.

O'Quinn argues that her failure to make phone calls to get her shifts covered was not an intentional refusal of an employer's reasonable request; it was the result of her incapacity. She contends that she was too ill to travel to work to call substitutes, and she knew of no other way to meet the employer's expectation. But the ULJ found:

O'Quinn also assumed that she was physically unable to carry out the employer's request. This too is based on the mistaken assumption. The evidence is clear that O'Quinn was well enough to make a phone call. She called Case. O'Quinn was too sick to go to the restaurant. However, no one was asking her to go to the restaurant.

The evidence substantially sustains the ULJ's findings. The testimony of Case and O'Quinn reflects that O'Quinn knew about Noodles' policy, but she did not ask for clarification of the policy or for help with calling other employees, and she did not make any effort to find coverage for her missed shifts. O'Quinn's conduct demonstrated negligence because it was due to the unreasonable assumption that she needed to appear at a restaurant while ill to call employees. *See Dourney v. CMAK Corp.*, 796 N.W.2d 537, 540 (Minn. App. 2011) (discussing negligence in the context of section 268.095,

6

subdivision 6(a), defining negligence as "the failure to use the care that a reasonable person would use in the same or similar circumstances" and addressing inadvertence exception to misconduct definition). O'Quinn's failure to make any effort to find coverage for her missed shifts displayed a serious violation of a standard of behavior that Noodles had the right to reasonably expect of its employees. The ULJ did not err by concluding that O'Quinn's conduct was employment misconduct.

Because O'Quinn's failure to comply with Noodles' employee-absence policy constituted employment misconduct that disqualified her from receiving unemployment benefits, we need not address the parties' arguments regarding O'Quinn's tardiness. *Cf. Woodward v. Interstate Office Sys.*, 379 N.W.2d 177, 179-80 (Minn. App. 1985) (affirming a decision of ineligibility to receive unemployment benefits where employee was discharged for several reasons, at least one of which constituted misconduct).

**Affirmed.**